## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TRI-STAR DEVELOPMENT COMPANY, LLC,** 14680 S. Lakeshore Drive Olathe, Kansas, 66061;

**GREGORY D. PRIEB,** 13938 Canterbury Circle, Leawood, Kansas 66224;

**GREGORY D. PRIEB AS THE TRUSTEE OF THE GREGORY D. PRIEB INTER VIVOS TRUST AGREEMENT under TRUST AGREEMENT DATED 1/29/1993,** 13938 Canterbury Circle, Leawood, Kansas 66224;

**PHILIP W. MARTENS,** 2111 East Santa Fe, Olathe, Kansas 66062;

**PHILIP W. MARTENS AS TRUSTEE OF THE PHILIP WAYNE MARTENS REVOCABLE LIVING TRUST DATED FEBRUARY 9, 1989,** 2111 East Santa Fe, Olathe, Kansas 66062**;**

**DAVID M. MARTENS,** 14680 S. Lakeshore Drive Olathe, Kansas, 66061;

**DAVID M. MARTENS, AS TRUSTEE OF THE DAVID M. MARTENS INTER VIVOS TRUST AGREEMENT,** 14680 S. Lakeshore Drive Olathe, Kansas, 66061;

**v.**

**the FEDERAL DEPOSIT INSURANCE CORPORATION,** as Receiver for the First National Bank of Olathe, 550 17th Street NW Washington, District of Columbia 20429-9990;

and

**ENTERPRISE BANK AND TRUST,** 150 North Meramec Avenue Clayton, MO 63105

**Defendants.**

**Case No. _____**

## COMPLAINT

Plaintiffs Tri-Star Development Company, LLC ("Tri-Star" and/or the "Company"), Gregory D. Prieb ("Gregory Prieb"), Gregory D. Prieb as the trustee of the Gregory D. Prieb Inter Vivos Trust Agreement under Trust Agreement dated 1/27/1993 ("Prieb Trust"), Philip W. Martens ("Philip Martens"), Philip W. Martens as the trustee of the Philip Wayne Martens Revocable Living Trust dated February 9, 1989 ("Philip Martens Trust"), David M. Martens ("David Martens"), David M. Martens as the trustee of the David M. Martens Inter Vivos Trust Agreement ("David Martens Trust") (hereafter sometimes "Plaintiffs" and/or the "Tri-Star Parties") for their Complaint against Defendant Federal Deposit Insurance Corporation (hereafter "FDIC") as Receiver for the First National Bank of Olathe (hereafter "FNBO" and/or the "Bank")[1], and Enterprise Bank and Trust ("Enterprise") (hereafter sometimes collectively referred to as "Defendants") state as follows:

## Parties

1.      Plaintiff Tri-Star Development Company, LLC is a Kansas limited liability company.

2.      Plaintiff Gregory Prieb is an individual residing at 13938 Canterbury Circle, Leawood, Kansas 66224.

3.      Plaintiff Gregory Prieb, in his capacity as Trustee of the Prieb Trust, is an individual residing at 13938 Canterbury Circle, Leawood, Kansas 66224.

4.      Plaintiff Philip Martens is an individual residing at 2111 East Santa Fe, Olathe, Kansas 66062.

---

[1]      Herein, the term "Bank" refers to FNBO, Enterprise, the FDIC and all other successors in interest to FNBO.

5.      Plaintiff Philip Martens, in his capacity as Trustee of the Philip Martens Trust, is an individual residing at 2111 East Santa Fe, Olathe, Kansas 66062.

6.      Plaintiff David Martens, is an individual residing at 14680 S. Lakeshore Drive Olathe, Kansas, 66061.

7.      Plaintiff David Martens, in his capacity as Trustee of the David Martens Trust, is an individual residing at 14680 S. Lakeshore Drive, Olathe, Kansas 66061

8.      Defendant FNBO is a national banking association with its principal offices located at 444 East Santa Fe, Olathe, Kansas 66061.

9.      Defendant FDIC, as Receiver for Defendant FNBO, is an agency organized under the laws of the United States of America and having its principal place of business and headquarters in Washington, D.C..

<u>Jurisdiction and Venue</u>

10.     On March 8, 2012, pursuant to 12 U.S.C. § 1821(d), Plaintiffs previously submitted a claim against Defendants FNBO and the FDIC, as Receiver for Defendant FNBO (the "FNBO Claim").  *See* Proof of Claim, attached hereto as **Exhibit A**.

11.     The allegations and claims set forth in the FNBO Claim are substantially similar to the allegations and claims made by the Tri-Star Parties in their *Answer and Counterclaim to Plaintiff's Verified Petition for Mortgage Foreclosure and Other Relief* ("Answer and Counterclaim") (Doc. #35), in the matter currently pending in the District Court of Johnson County, Kansas, and styled as *First National Bank of Olathe v. Gregory D. Prieb, et al.*, Case No. 11CV-05490.  *See* **Exhibit B**.

12.     On August 31, 2012, the FDIC issued a notice of disallowance of the FNBO Claim. *See* Notice of Disallowance of Claim, attached hereto as **Exhibit C**.

13.     Pursuant to 12 U.S.C. § 1821(d)(6), this Court has jurisdiction to hear and review, *de novo*, Plaintiffs' previously disallowed FNBO Claim where, as here, the claimant files suit within 60 days of the notice of disallowance.

14.     While varying the form of the FNBO Claim in order to "file suit on [their] claim" pursuant to 12 U.S.C. § 1821, the instant Complaint nonetheless retains the substance of the Tri-Star Parties' previously disallowed Proof of Claim submitted to the FDIC.

## Common Allegations to All Counts

### *Initiation of the relationship by the Bank.*

30.     The Bank sought banking business from the Tri-Star Parties for many years dating back to at least 1978.

31.     During that time period, the Bank through a sequence of conduct, established a common basis of understanding and a course of dealing and course of performance in the manner to conduct business with the Tri-Star Parties, and their related entities.

32.     The Bank sought out the Tri-Star Parties to establish a relationship with the Bank and to move certain accounts and loans to the Bank.  The Bank also sought out relationships with the Tri-Star Parties so that the Bank could obtain development loan business and construction loan business from the Tri-Star Parties.

33.     In order to effectuate the completion of the Plaintiffs' and the Company's projects, there was a relationship of trust between the Plaintiffs, the Company and the Bank as it relates to the nature of the financing of the various projects.

34.     The Bank repeatedly promoted itself to the Tri-Star Parties as a trusted financial resource.

4

35.     The Tri-Star Parties highly regarded, and placed their trust in, and relied on the Bank as their trusted financial resource and the Bank knew that the Tri-Star Parties relied on them for this advice.

36.     The Bank also considered the Tri-Star Parties to be excellent customers with whom the Bank wanted to continue to expand their relationship.

37.     The Tri-Star Parties believed that when the Bank, its officers and directors made promises to the Tri-Star Parties that the Bank would meet these high standards for honesty and fairness in all of its dealings with the Tri-Star Parties, that those promises would be fulfilled.

38.     The Tri-Star Parties also believed they could depend on the Bank's truthfulness, trustworthiness, and loyalty; that the Bank would be devoted and faithful to protecting the Tri-Star Parties' interests and would not be dishonest or disloyal to the Tri-Star Parties' business interests.

39.     The Bank also openly promoted its honesty and the ease with which the Tri-Star Parties could deal with the Bank on a daily basis, including that the Bank would never make any false or misleading statements to the Tri-Star Parties.

***The Company's land purchase in 2004.***

40.     Prior to 2004, the Company located and sought to acquire land in Olathe, Kansas and Gardner, Kansas for several development projects.

41.     As part of those development projects, the Bank committed to fund the development projects, along with a number of related construction projects.

***2004 Mortgage and the Obligations Secured***

42.     The September 14, 2004 Mortgage (the "2004 Mortgage") was given by Tri-Star and the total amount secured by the Mortgage was not to exceed $2,625,000.00.

43.     According to the terms of the 2004 Mortgage, the total amount secured by the 2004 Mortgage could increase and/or decrease over time.

44.     The 2004 Mortgage was intended to be secured by the real property that comprises the entire Oak Run subdivision in Olathe, Kansas (the "Oak Run Property").

45.     According to its terms, the 2004 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."   The 2004 Mortgage defines "Secured Debts" as:

**A. Specific Debts.**   The following debts and all extensions, renewals, refinancings, modifications and replacements.   A promissory note or other agreement, No. 5006069, dated September 14, 2004, from Mortgagor to Lender, with a loan amount of $2,625,000.00 and maturing on September 14, 2007.

**B. All Debts**.   All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.   If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.   Any such commitment must be in writing.   In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.   This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**   All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

46.     The 2004 Mortgage evidenced an intent by the parties to secure performance under the various guaranty agreements executed by the Tri-Star Parties between 2004 and 2011 (the "Guaranties"), in that the 2004 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts."   Although the 2004 Mortgage fails to specifically define "document relating to the Secured Debts," this

6

term necessarily encompasses the Guaranties.

***The 2005 Mortgage and the Obligations Secured***

47.  The 2005 Mortgage was given by Tri-Star and the total amount secured by the Mortgage was not to exceed $1,100,000.00.

48.  According to the terms of the 2005 Mortgage, the total amount secured by the 2005 Mortgage could increase and/or decrease over time.

49.  The 2005 Mortgage was intended to be secured by the property that comprises a portion of the 3rd Plat of the Oak Run subdivision (the "Oak Run 3rd Plat").

50.  According to its terms, the 2005 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."  The 2005 Mortgage defines "Secured Debts" as:

  **A. Specific Debts.**  The following debts and all extensions, renewals, refinancings, modifications and replacements.  A promissory note or other agreement, No. 5006402, dated June 23, 2005, from Mortgagor to Lender, with a loan amount of $1,100,000.00 with an initial interest rate based on then current index value as the promissory note prescribes and maturing on June 23, 2007.  One or more of the debts secured by this Security Instrument contains a future advance provision.

  **B. All Debts**.  All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.  If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.  Any such commitment must be in writing.  In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.  This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

  **C. Sums Advanced.**  All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

7

51.     The 2005 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the 2005 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts."   Although the 2005 Mortgage fails to specifically define "document relating to the Secured Debts," this term necessarily encompasses the Guaranties.

***The January 2006 Mortgage and the Obligations Secured***

52.     The January 2006 Mortgage was given by Tri-Star and the total amount secured by the Mortgage was not to exceed $1,170,000.00.

53.     According to the terms of the January 2006 Mortgage, the total amount secured by the January 2006 could increase and/or decrease over time.

54.     The January 2007 Mortgage was also intended to be secured by the Arbor Creek Tract L Property.

55.     According to its terms, the January 2006 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."   The January 2006 Mortgage defines "Secured Debts" as:

   A. **Specific Debts.**   The following debts and all extensions, renewals, refinancings, modifications and replacements.   A promissory note or other agreement, No. 5006641, dated January 17, 2006, from Mortgagor to Lender, with a loan amount of $1,170,000.00 with an initial interest rate of 7.25 percent per year…and maturing on January 17, 2007.   One or more of the debts secured by this Security Instrument contains a future advance provision.

   B. **All Debts**.   All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.   If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.   Any such commitment must be in writing.   In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.   This

8

Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

56. The January 2006 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the January 2006 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts." Although the January 2006 Mortgage fails to specifically define "document relating to the Secured Debts," this term necessarily encompasses the Guaranties.

*The June 2006 Mortgage and the Obligations Secured*

57. The June 2006 Mortgage was given by Tri-Star and the total amount secured by the June 2006 Mortgage was not to exceed $1,500,000.00.

58. According to the terms of the June 2006 Mortgage, the total amount secured by the June 2006 Mortgage could increase and/or decrease over time.

59. The June 2006 Mortgage was intended to be secured by the property that comprises the entire Madison Reserve subdivision (the "Madison Reserve Property").

60. According to its terms, the June 2006 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument." The June 2006 Mortgage defines "Secured Debts" as:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 5006805, dated June 8, 2006, from Mortgagor to Lender, with a loan amount of $1,500,000.00 with an initial interest rate of 7.75 percent per year…and maturing on June 8, 2007. One or more of the debts secured by this Security Instrument contains a future advance provision.

9

**B. All Debts**.  All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.  If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.  Any such commitment must be in writing.  In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.  This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**  All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

61.     Under the 2009 Modification of the June 2006 Mortgage (the "Mortgage Modification"), the Bank, and its successors in interest, claim that additional property was added to secure the "Secured Debts."

62.     The June 2006 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the June 2006 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts." Although the June 2006 Mortgage fails to specifically define "document relating to the Secured Debts," this term necessarily encompasses the Guaranties.

***The January 2007 Mortgage and the Obligations Secured***

63.     The January 2007 Mortgage was given by Tri-Star and the total amount secured by the January 2007 Mortgage was not to exceed $640,000.00.

64.     According to the terms of the January 2007 Mortgage, the total amount secured by the January 2007 Mortgage could increase and/or decrease over time.

65.     The January 2007 Mortgage was also intended to be secured by the Arbor Creek Tract L Property.

66.     According to its terms, the January 2007 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."   The January 2007 Mortgage defines "Secured Debts" as:

**A. Specific Debts.**   The following debts and all extensions, renewals, refinancings, modifications and replacements.   A promissory note or other agreement, No. 5006968, dated January 19, 2007, from Mortgagor to Lender, with a loan amount of $640,000.00 with an initial interest rate of 8.0 percent per year…and maturing on January 19, 2008.   One or more of the debts secured by this Security Instrument contains a future advance provision.

**B. All Debts**.   All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.   If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.   Any such commitment must be in writing.   In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.   This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**   All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

67.     The January 2007 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the January 2007 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts."   Although the January 2007 Mortgage fails to specifically define "document relating to the Secured Debts," this terms necessarily encompasses the Guaranties.

***The April 2007 Mortgage and the Obligations Secured***

68.     The April 2007 Mortgage was given by Tri-Star and the total amount secured by the April 2007 Mortgage was not to exceed $1,250,000.00.

69.     According to the terms of the April 2007 Mortgage, the total amount secured by the April 2007 Mortgage could increase and/or decrease over time.

70.     The April 2007 Mortgage was intended to be secured by the property that comprises a portion of the Arbor Creek Village subdivision known as Tract L (the "Arbor Creek Tract L Property").

71.     According to its terms, the April 2007 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."  The April 2007 Mortgage defines "Secured Debts" as:

**A. Specific Debts.**  The following debts and all extensions, renewals, refinancings, modifications and replacements.   A promissory note or other agreement, No. 5007032, dated April 10, 2007, from Mortgagor to Lender, with a loan amount of $1,250,000.00 with an initial interest rate of 8.0 percent per year…and maturing on April 10, 2008.   One or more of the debts secured by this Security Instrument contains a future advance provision.

**B. All Debts**.   All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.   If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.   Any such commitment must be in writing.   In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.   This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**  All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

72.    The April 2007 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the April 2007 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts."  Although the April 2007 Mortgage fails to specifically define "document relating to the Secured Debts," this term necessarily encompasses the Guaranties.

***The June 2007 Mortgage and the Obligations Secured***

73.    The June 2007 was given by Tri-Star and the total amount secured by the June 2007 Mortgage was not to exceed $1,900,000.00.

74.    According to the terms of the June 2007 Mortgage, the total amount secured by the June 2007 Mortgage could increase and/or decrease over time.

75.    The June 2007 Mortgage was intended to be secured by the property that comprises a portion of the Fourth Plat of the Oak Run subdivision (the "Oak Run Fourth Plat").

76.    According to its terms, the June 2007 Mortgage was given "to secure the 'Secured Debts' and Mortgagor's performance under this Security Instrument."  the June 2007 Mortgage defines "Secured Debts" as:

> A. **Specific Debts.**   The following debts and all extensions, renewals, refinancings, modifications and replacements.   A promissory note or other agreement, No. 5007096, dated June 11, 2007, from Mortgagor to Lender, with a loan amount of $1,900,000.00 and maturing on June 11, 2008.  One or more of the debts secured by this Security Instrument contains a future advance provision.
>
> B. **All Debts**.   All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.  If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.  Any such commitment must be in writing.  In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent Security Interest in the Mortgagor's principal dwelling that is created by this Security Instrument.  This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a

"consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

77.     The June 2007 Mortgage evidenced an intent by the parties to secure performance under the Guaranties in that the June 2007 Mortgage provided that Mortgagor will be in default if "a default occurs under the terms of any other document relating to the Secured Debts." Although the June 2007 Mortgage fails to specifically define "document relating to the Secured Debts," this term necessarily encompasses the Guaranties.

78.     Collectively, the 2004 Mortgage and the June 2007 Mortgage are hereafter sometimes referred to as the "Oak Run Mortgages."

79.     The 2005 Mortgage is hereafter sometimes referred to as the "Oak Run Third Plat Mortgage."

80.     Collectively, the January 2006 Mortgage, the January 2007 Mortgage and the April 2007 Mortgage are hereafter sometimes referred to as the "Arbor Creek Mortgages."

81.     The June 2006 Mortgage is hereafter sometimes referred to as the "Madison Reserve Mortgage."

82.     Collectively, the 2004 Mortgage, the 2005 Mortgage, the January 2006 Mortgage, the June 2006 Mortgage, the January 2007 Mortgage, the April 2007 Mortgage and the June 2007 Mortgage are hereafter sometimes referred to as the "Mortgages."

***Events of default under the Mortgages.***

83.     Under the terms of the Mortgages, certain specified "Events of Default" were set out including a failure by the Borrower to make a payment in full when due.

84.     The 2004 Mortgage refers to the term "default," but does not otherwise define that

term.

85.     The Madison Reserve Mortgage, the Oak Run 3rd Plat Mortgage, the Arbor Creek Mortgages and the June 2007 Mortgage provide that "Mortgagor will be in default if any of the following occur:

A.  **Payments.** Mortgagor fails to make a payment in full when due.

B.  **Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

C.  **Business Termination.**  Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

D.  **Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

E.  **Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

F.  **Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

G.  **Misrepresentation.**  Mortgagor makes any verbal or written statement or provides any financial information that is untrue; inaccurate, or conceals a material fact at the time it is made or provided.

H.  **Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

I.  **Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J.  **Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

K.  **Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

L. **Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

M. **Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

N. **Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

86.     The Mortgages are conflicting and ambiguous concerning what constitutes an event of default by the mortgagors, especially in that some of the mortgages purport to secure the same alleged indebtedness and some of the Notes are secured by collateral referenced in more than one mortgage.

*The Construction Loan Agreement*

87.     On June 11, 2007, Tri-Star and the Bank entered into a Construction Loan Agreement in connection with the Oak Run Fourth Plat Note (Loan No. 5007096).

88.     The Construction Loan Agreement defines "Default" and remedies upon default separate from those set forth in the Mortgages and the Notes, as more specifically explained hereafter.

*The 2004 Note and its written provisions.*

89.     In September of 2004, the Bank and the Company executed a Note entitled "Promissory Note (Commercial – Single Advance – Variable Rate)" (the "2004 Note" and/or "Note #5006069").

90.     The 2004 Note provides that it is secured by the 2004 Mortgage.

91.     The 2004 Note does not define "Loan Documents."

92.     The 2004 Note defines "Note" as "this document, and any extensions, renewals,

16

modifications and substitutions of this Note."

93.     The 2004 Note provides that its maturity date is September 14, 2007.

94.     With respect to the parties, the 2004 Note provides that "[t]he pronouns 'I,' 'me,' and 'my' refer to each Borrower signing this Note, individually and together with their heirs, successors and assigns, and each other person or legal entity including guarantors, endorsers, and sureties who agrees to pay this Note. 'You' and 'Your' refer to the Lender, with its participants or syndicators, successors and assigns or any person or company that acquires an interest in the Loan."

95.     The 2004 Note further provides that "[f]or value received, I promise to pay you or your order, at your address, or at such other location as you may designate, the principal sum of $2,625,000.00 {Principal} plus interest from September 14, 2004 on the unpaid Principal balance until this Note matures or this obligation is accelerated."

96.     Concerning default interest, the 2004 Note provides that "[i]f you declare a default under the terms of this Loan, including for failure to pay in full at maturity, you may increase the Interest Rate otherwise payable as described in this section.  In such event, interest will accrue on the unpaid Principal balance of this Note at 15.000 percent until paid in full."

97.     The 2004 Note made no specific provision for any "Future Advances" or any procedure by which "Future Advances" could be requested by the Borrower.

***The September 2007 Change in Terms Agreement***

98.     The September 2007 Change in Terms Agreement provides that it is intended to change the terms of the 2004 Note.

99.     The September 2007 Change in Terms Agreement defines "indebtedness" as:

Promissory Note Dated September 14, 2004, in the original amount of $2,625,000.00, with a current outstanding balance of $1,430,742.51.

17

100.   The September 2007 Change in Terms Agreement provides that the collateral for the 2004 Note is the 2004 Mortgage.

101.   The September 2007 Change in Terms Agreement included the following Description of Change in Terms:

Extension of maturity date, decrease interest rate and add auto renewal.

102.   The Tri-Star Parties received no consideration for these material changes to the terms of the 2004 Note.

***The September 2009 Change in Terms Agreement***

103.   The September 2009 Change in Terms Agreement provides that it is intended to change the terms of the 2004 Note.

104.   The September 2009 Change in Terms Agreement defines "indebtedness" as:

Promissory Note dated September 14, 2004, in the Original Amount of $2,625,000.00, with a Current Outstanding Balance of $1,430,742.51, and all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof.

105.   The September 2009 Change in Terms Agreement added collateral for the 2004 Note which included the 2005 Mortgage, the June 2006 Mortgage and the June 2007 Mortgage.

106.   The Tri-Star Parties received no consideration for their agreement to add collateral to the 2004 Note.

107.   The September 2009 Change in Terms Agreement also included the following Description of Change in Terms:

Extension of maturity date to July 15, 2011, interest rate change from The First National Bank of Olathe prime rate minus .50% to The First National Bank of Olathe prime rate minus .50%, with a floor interest rate of 4.75%, and payment change.

108.   The Tri-Star Parties received no consideration for these material changes to the terms of the 2004 Note.

18

109.   The September 2009 Change in Terms Agreement also included the following provisions that were not set forth in the 2004 Note:

**MAINTENANCE OF LOAN TO VALUE**.  In order to monitor the Loan to Value Ratio requirement, the property may be re-appraised, June 15, 2010, or any date thereafter, at the borrowers [sic] expense, as the Bank reserves the right to order a new appraisal at the cost of the Borrower should there be any significant changes in the project's performance or market conditions, including but not limited to:

- The net operating income of the property has decreased
- The lease-up or sell-out of the property has not met the original projections
- The property has had obvious physical changes (fire, wind damage, major renovation, etc.)
- The property continues to remain vacant for an extended period of time
- The highest and best use has changed on an owner-occupied property
- The tax assessment value has declined
- An additional legal or financial burden is placed upon the property, such as the discovery of environmental risk or the creation of an easement
- Market conditions of supply and demand are out of balance
- Investment, capitalization, and discount rates are trending upwards

At the signing of this document, the overall LTV of collateral appraised value to loan amount (Loan Numbers 5006069, 5007096, and 5006402) is 77.86% ($5,530,000.00 appraised value against $4,305,750.00 loan amount).  Upon receipt of an updated appraisal, Borrower agrees to an immediate principal and/or commitment reduction or pledge of additional collateral to maintain the original LTV ratio of the loan, using Lender standard LTV ratios.

**RELEASE PROVISION**.
3rd Phase Lots of Oak Run: $38,000.00
4th Phase Lots of Oak Run: $36,000.00
Madison Reserve lots: $36,600.00
1st & 2nd Phase Lots of Oak Run: $33,000.00.

**CURTAILMENTS**. Borrower will make the following minimum cumulative principal payments on the loans, either through lot sales or from other sources, by the following dates:

| | |
|---|---|
| December 1, 2009 | $105,000.00 |
| March 1, 2010 | $210.000.00 |
| June 1, 2010 | $316,000.00 |
| September 1, 2010 | $420,000.00 |
| December 1, 2010 | $525,000.00 |
| March 1, 2011 | $630,000.00 |
| June 1, 2011 | $735,000.00 |

The above principal reduction schedule applies collectively to Loan Numbers 5006805, 5007096, 5006402, and 5006069 with Lender.  To the extent of lot sale proceeds, the principal reduction shall apply first to the original applicable loan. All other principal reductions shall apply to the loan(s) specified by Borrower to Lender at the time of payment.

**CONSTRUCTION LOAN FINANCING**. First National Bank of Olathe will provide construction loans under reasonable terms and conditions adhering to the following schedule.

PRESENT INVENTORY:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 4 Construction Loans |
| Martens Family Enterprises. Inc. | 4 Construction Loans |
| Prieb Homes, Inc. | 2 Construction Loans (To Be Booked) |

Madison Reserve Subdivision
| | |
|---|---|
| Martens. Inc. | 1 Construction Loan |
| Martens Family Enterprises. Inc. | 1 Construction Loan |
| Prieb Homes, Inc. | 1 Construction Loan |

At such time that Martens, Inc. or Martens Family Enterprises, Inc. sell one of the existing properties in Oak Run, a construction loan will be available to Prieb Homes. Inc. in either Oak Run subdivision or Madison Reserve subdivision. At such time that the other "Martens" entity sells one of the existing properties in Oak Run (leaving both Martens with three properties), a construction loan will be available to Prieb Homes, Inc., in the other subdivision that wasn't chosen with the first sale. These replacement of specs as described will enable the inventory to adhere to the following schedule which will be used for the duration of the development loan:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 3 Properties |
| Martens Family Enterprises, Inc. | 3 Properties |
| Prieb Homes, Inc. | 3 Properties |

Madison Reserve Subdivision·
| | |
|---|---|
| Martens. Inc. | 1 Property |
| Martens Family Enterprises, Inc. | 1 Property |
| Prieb Homes, Inc. | 1 Property |

110.    The Tri-Star Parties received no consideration for these additional obligations and

provisions that were added to the 2004 Note.

***The Madison Reserve Note and its written provisions.***

20

111.    On June 6, 2006, the Bank and the Company executed a Note entitled "Promissory Note (Commercial Draw)" (the "Madison Reserve Note" and/or "Note #5006805").

112.    The Madison Reserve Note provides that it is secured by the June 2006 Mortgage (the Madison Reserve Mortgage).

113.    The Madison Reserve Note defines "Loan Documents" as "all the documents executed as a part of or in connection with the Loan."

114.    The Madison Reserve Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

115.    The Madison Reserve Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note."

116.    The Madison Reserve Note provides that its maturity date is June 8, 2007.

117.    With respect to the parties, the Madison Reserve Note provides that "[t]he pronouns 'I,' 'me,' and 'my' refer to each Borrower signing this Note, individually and together. 'You' and 'Your' refer to the Lender."

118.    The Madison Reserve Note further provides that "[f]or value received, I promise to pay you or your order, at your address, or at such other location as you may designate, amounts advanced from time to time under the terms of this Note up to the maximum total principal balance of $1,500,000.00 (Principal) plus interest from the date of disbursement, on the unpaid outstanding Principal balance until this Note matures or this obligation is accelerated"

119.    Concerning default interest, the Madison Reserve Note provides that "[i]f you declare a default under the terms of this loan, including for failure to pay in full at maturity, you

21

may increase the Interest Rate payable on the outstanding Principal balance of this Note. In such event, interest will accrue on the outstanding Principal balance at 15.000 percent until paid in full."

120.     Concerning future advances, the Madison Reserve Note provided that "[a]ll advances made will be made subject to the terms of a separate construction loan agreement and all other terms and conditions of this loan."

*The June 2008 Change in Terms Agreement*

121.     The June 2008 Change in Terms Agreement provides that it is intended to change the terms of the Madison Reserve Note.

122.     The June 2008 Change in Terms Agreement defines "indebtedness" as:

Promissory Note dated June 8, 2006, in the Original Amount of $1,500,000.00, with a Current Outstanding Balance of $640,000.00, and all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof.

123.     The June 2008 Change in Terms Agreement provides that the collateral for the June 2006 Note is the June 2006 Mortgage.

124.     The June 2008 Change in Terms Agreement included the following Description of Change in Terms:

Extension of maturity date to June 8, 2009; extension of auto renewal feature.

125.     The Tri-Star Parties received no consideration for these material changes to the terms of the June 2006 Note.

*The June 2009 Change in Terms Agreement for the Madison Reserve Note*

126.     The June 2009 Change in Terms Agreement for the 2006 Note ("2009 CIT for the Madison Reserve Note") provides that it is intended to change the terms of the June 2006 Note.

127.     The 2009 CIT for the Madison Reserve Note defines "indebtedness" as:

Promissory Note dated June 8, 2006, in the Original Amount of $1,500,000.00, with a Current Outstanding Balance of $554,000.00, and all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof.

128.    The 2009 CIT for the Madison Reserve Note added collateral for the Madison Reserve Note which included the 2004 Mortgage, the 2005 Mortgage, the June 2006 Mortgage and the June 2007 Mortgage.

129.    The Tri-Star Parties received no consideration for their agreement to add collateral to the Madison Reserve Note.

130.    The 2009 CIT for the Madison Reserve Note also included the following Description of Change in Terms:

Extension of maturity date to July 15, 2011, interest rate change from Lender's Prime Rate minus .25% to Lender's Prime Rate minus .50%, with a floor of 4.75%, payment change, addition of collateral, and addition of covenants.

PAYMENT. Borrower will pay this loan in one principal payment of $554,000.00 plus interest on July 15, 2011. This payment due on July 15, 2011, will be for all principal and all accrued interest not yet paid.  In addition, Borrower will pay regular quarterly payments of all accrued unpaid interest due as of each payment date, beginning July 15, 2009, with all subsequent payments to be due on the same day of each quarter after that.

131.    The Tri-Star Parties received no consideration for these material changes to the terms of the Madison Reserve Note.

132.    The 2009 CIT for the Madison Reserve Note also included the following provisions not set forth in the original Madison Reserve Note:

**MAINTENANCE OF LOAN TO VALUE**.  In order to monitor the Loan to Value Ratio requirement, the property may be re-appraised, June 15, 2010, or any date thereafter, at the borrowers [sic] expense, as the Bank reserves the right to order a new appraisal at the cost of the Borrower should there be any significant changes in the project's performance or market conditions, including but not limited to:

• The net operating income of the property has decreased
• The lease-up or sell-out of the property has not met the original projections

23

- The property has had obvious physical changes (fire, wind damage, major renovation, etc.)
- The property continues to remain vacant for an extended period of time
- The highest and best use has changed on an owner-occupied property
- The tax assessment value has declined
- An additional legal or financial burden is placed upon the property, such as the discovery of environmental risk or the creation of an easement
- Market conditions of supply and demand are out of balance
- Investment, capitalization, and discount rates are trending upwards

At the signing of this document, the overall LTV of collateral appraised value to loan amount (Loan Numbers 5006069, 5007096, and 5006402) is 77.86% ($5,530,000.00 appraised value against $4,305,750.00 loan amount).   Upon receipt of an updated appraisal, Borrower agrees to an immediate principal and/or commitment reduction or pledge of additional collateral to maintain the original LTV ratio of the loan, using Lender standard LTV ratios.

**RELEASE PROVISION**.
3rd Phase Lots of Oak Run: $38,000.00
4th Phase Lots of Oak Run: $36,000.00
Madison Reserve lots: $36,600.00
1st & 2nd Phase Lots of Oak Run: $33,000.00.

**CURTAILMENTS**. Borrower will make the following minimum cumulative principal payments on the loans, either through lot sales or from other sources, by the following dates:

| | |
|---|---|
| December 1, 2009 | $105,000.00 |
| March 1, 2010 | $210.000.00 |
| June 1, 2010 | $316,000.00 |
| September 1, 2010 | $420,000.00 |
| December 1, 2010 | $525,000.00 |
| March 1, 2011 | $630,000.00 |
| June 1, 2011 | $735,000.00 |

The above principal reduction schedule applies collectively to Loan Numbers 5006805, 5007096, 5006402, and 5006069 with Lender.  To the extent of lot sale proceeds, the principal reduction shall apply first to the original applicable loan. All other principal reductions shall apply to the loan(s) specified by Borrower to Lender at the time of payment.

**CONSTRUCTION LOAN FINANCING**. First National Bank of Olathe will provide construction loans under reasonable terms and conditions adhering to the following schedule.

PRESENT INVENTORY:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 4 Construction Loans |
| Martens Family Enterprises. Inc. | 4 Construction Loans |
| Prieb Homes, Inc. | 2 Construction Loans (To Be Booked) |

Madison Reserve Subdivision
| | |
|---|---|
| Martens. Inc. | 1 Construction Loan |
| Martens Family Enterprises. Inc. | 1 Construction Loan |
| Prieb Homes, Inc. | 1 Construction Loan |

At such time that Martens, Inc. or Martens Family Enterprises, Inc. sell one of the existing properties in Oak Run, a construction loan will be available to Prieb Homes. Inc. in either Oak Run subdivision or Madison Reserve subdivision. At such time that the other "Martens" entity sells one of the existing properties in Oak Run (leaving both Martens with three properties), a construction loan will be available to Prieb Homes, Inc., in the other subdivision that wasn't chosen with the first sale. These replacement of specs as described will enable the inventory to adhere to the following schedule which will be used for the duration of the development loan:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 3 Properties |
| Martens Family Enterprises, Inc. | 3 Properties |
| Prieb Homes, Inc. | 3 Properties |

Madison Reserve Subdivision·
| | |
|---|---|
| Martens. Inc. | 1 Property |
| Martens Family Enterprises, Inc. | 1 Property |
| Prieb Homes, Inc. | 1 Property |

133.    The Tri-Star Parties received no consideration for these additional obligations and provisions that were added to the Madison Reserve Note.

**The Oak Run Fourth Plat Note and its written provisions.**

134.    On June 11, 2007, the Bank and the Company executed a Note entitled "Promissory Note (Commercial Draw)" (the "Oak Run Fourth Plat Note" and/or "Note #5007096").

135.    The Oak Run Fourth Plat Note provides that it is secured by "Mortgage – 4th Phase – Oak Run."

136.    Oak Run Fourth Plat Note defines "Loan Documents" as "all the documents

25

executed as a part of or in connection with the Loan."

137.   Oak Run Fourth Plat Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

138.   Oak Run Fourth Plat Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note."

139.   Oak Run Fourth Plat Note  provides that its maturity date is June 11, 2008.

140.   With respect to the parties, Oak Run Fourth Plat Note provides that "[t]he pronouns 'I,' 'me,' and 'my' refer to each Borrower signing this Note, individually and together. 'You' and 'Your' refer to the Lender."

141.   Oak Run Fourth Plat Note further provides that "[f]or value received, I promise to pay you or your order, at your address, or at such other location as you may designate, amounts advanced from time to time under the terms of this Note up to the maximum total principal balance of $1,900,000.00 (Principal) plus interest from the date of disbursement, on the unpaid outstanding Principal balance until this Note is paid in full and you have no further obligations to make advances to me under the Loan."

142.   Concerning default interest, Oak Run Fourth Plat Note provides that "[i]f you declare a default under the terms of the Loan, including for failure to pay in full at maturity, you may increase the Interest Rate payable on the outstanding Principal balance of this Note. In such event, interest will accrue Usury Rate [sic]."

143.   Concerning future advances, Oak Run Fourth Plat Note provides that "[a]ll advances made will be made subject to all other terms and conditions of the Loan."

***The July 2007 Debt Modification Agreement***

144.   The 2007 Debt Modification Agreement modified the terms of the Oak Run

Fourth Plat Note and provides that it is modifying a prior obligation referred to as Loan No. 5007096.

145.    The 2007 Debt Modification Agreement provides that:

The Prior Obligation is modified as follows:

A.  Maturity and Payments. The maturity and payment provisions are modified to read:

(1) PAYMENT.  I agree to pay the Loan on demand, but if no demand is made, I agree to pay the Loan in installments of accrued interest beginning December 11, 2007, and then on the same day in each 6th month thereafter.  I agree to pay the entire unpaid Principal and any accrued but unpaid interest on June 11, 2008. Payments will be rounded to the nearest $.01. With the final payment I also agree to pay any additional fees or charges owing and the amount of any advances you have made to others on my behalf.  Payments scheduled to be paid on the 29th, 30th or 31st day of a month that contains no such day will, instead, be made on the last day of such month.

B.  Completion. The completion date provision of the construction loan agreement is modified to read:

(1) Completion Date. The construction project's development and construction under the Plans and Specifications, including any installation of all fixtures and equipment and, at your request for any or all leases, the tenants' execution of letters of acceptance for possession of their leased premises, must be completed on or before June 11, 2008. The Plans and Specifications include the construction project's plans, specifications and drawings, with the certifications, any studies, data, working or shop drawings, any models, any contracts or agreements, and any changes and additions made concerning these plans, specifications, models, and drawings.

146.    The Tri-Star Parties received no consideration for the material changes to the Oak Run Fourth Plat Note that are described in the 2007 Debt Modification Agreement.

***The June 2009 Change in Terms Agreement for the Oak Run Fourth Plat Note***

147.    The June 2009 Change in Terms Agreement to the Oak Run Fourth Plat Note ("2009 CIT to the Oak Run Fourth Plat Note") provides that it is intended to change the terms of the Oak Run Fourth Plat Note.

148.    The 2009 CIT to the Oak Run Fourth Plat Note defines "indebtedness" as:

27

Promissory Note dated June 11, 2007, in the Original Amount of $1,900,000.00, with a Current Outstanding Balance of $1,682,485.00, and all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof.

149.    The 2009 CIT to the Oak Run Fourth Plat Note added collateral for the Oak Run Fourth Plat Note which included the 2004 Mortgage, the 2005 Mortgage, the June 2006 Mortgage and the June 2007 Mortgage.

150.    The Tri-Star Parties received no consideration for their agreement to add collateral to the Oak Run Fourth Plat Note.

151.    The 2009 CIT to the Oak Run Fourth Plat Note also included the following Description of Change in Terms:

Extension of maturity date to July 15, 2011, interest rate change from Lender's Prime Rate minus .50% to Lender's Prime Rate, with a floor of 4.75%, payment change, addition of collateral, and addition of covenants.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 15, 2011. In addition, Borrower will pay regular quarterly payments of all accrued unpaid interest due as of each payment date, beginning July 15, 2009, with all subsequent Interest payments to be due on the same day of each quarter after that.

152.    The Tri-Star Parties received no consideration for these material changes to the terms of the Oak Run Fourth Plat Note.

153.    The 2009 CIT to the Oak Run Fourth Plat Note also included the following provisions not set forth in the Oak Run Fourth Plat Note:

**MAINTENANCE OF LOAN TO VALUE**.  In order to monitor the Loan to Value Ratio requirement, the property may be re-appraised, June 15, 2010, or any date thereafter, at the borrowers [sic] expense, as the Bank reserves the right to order a new appraisal at the cost of the Borrower should there be any significant changes in the project's performance or market conditions, including but not limited to:

- The net operating income of the property has decreased
- The lease-up or sell-out of the property has not met the original projections
- The property has had obvious physical changes (fire, wind damage, major

28

renovation, etc.)
- The property continues to remain vacant for an extended period of time
- The highest and best use has changed on an owner-occupied property
- The tax assessment value has declined
- An additional legal or financial burden is placed upon the property, such as the discovery of environmental risk or the creation of an easement
- Market conditions of supply and demand are out of balance
- Investment, capitalization, and discount rates are trending upwards

At the signing of this document, the overall LTV of collateral appraised value to loan amount (Loan Numbers 5006069, 5007096, and 5006402) is 77.86% ($5,530,000.00 appraised value against $4,305,750.00 loan amount). Upon receipt of an updated appraisal, Borrower agrees to an immediate principal and/or commitment reduction or pledge of additional collateral to maintain the original LTV ratio of the loan, using Lender standard LTV ratios.

**RELEASE PROVISION**.
3rd Phase Lots of Oak Run: $38,000.00
4th Phase Lots of Oak Run: $36,000.00
Madison Reserve lots: $36,600.00
1st & 2nd Phase Lots of Oak Run: $33,000.00.

**CURTAILMENTS**. Borrower will make the following minimum cumulative principal payments on the loans, either through lot sales or from other sources, by the following dates:

| | |
|---|---|
| December 1, 2009 | $105,000.00 |
| March 1, 2010 | $210.000.00 |
| June 1, 2010 | $316,000.00 |
| September 1, 2010 | $420,000.00 |
| December 1, 2010 | $525,000.00 |
| March 1, 2011 | $630,000.00 |
| June 1, 2011 | $735,000.00 |

The above principal reduction schedule applies collectively to Loan Numbers 5006805, 5007096, 5006402, and 5006069 with Lender.  To the extent of lot sale proceeds, the principal reduction shall apply first to the original applicable loan. All other principal reductions shall apply to the loan(s) specified by Borrower to Lender at the time of payment.

**CONSTRUCTION LOAN FINANCING**. First National Bank of Olathe will provide construction loans under reasonable terms and conditions adhering to the following schedule.

PRESENT INVENTORY:

Oak Run Subdivision·
Martens, Inc.                                    4 Construction Loans

| | |
|---|---|
| Martens Family Enterprises. Inc. | 4 Construction Loans |
| Prieb Homes, Inc. | 2 Construction Loans (To Be Booked) |

Madison Reserve Subdivision

| | |
|---|---|
| Martens. Inc. | 1 Construction Loan |
| Martens Family Enterprises. Inc. | 1 Construction Loan |
| Prieb Homes, Inc. | 1 Construction Loan |

At such time that Martens, Inc. or Martens Family Enterprises, Inc. sell one of the existing properties in Oak Run, a construction loan will be available to Prieb Homes. Inc. in either Oak Run subdivision or Madison Reserve subdivision. At such time that the other "Martens" entity sells one of the existing properties in Oak Run (leaving both Martens with three properties), a construction loan will be available to Prieb Homes, Inc., in the other subdivision that wasn't chosen with the first sale. These replacement of specs as described will enable the inventory to adhere to the following schedule which will be used for the duration of the development loan:

| Oak Run Subdivision· | |
|---|---|
| Martens, Inc. | 3 Properties |
| Martens Family Enterprises, Inc. | 3 Properties |
| Prieb Homes, Inc. | 3 Properties |

| Madison Reserve Subdivision· | |
|---|---|
| Martens. Inc. | 1 Property |
| Martens Family Enterprises, Inc. | 1 Property |
| Prieb Homes, Inc. | 1 Property |

154.    The Tri-Star Parties received no consideration for these additional obligations and provisions that were added to the Oak Run Fourth Plat Note.

***The Oak Run Third Plat Note and its written provisions.***

155.    On June 23, 2007, the Bank and the Company executed a Note entitled "Promissory Note (Commercial Draw – Renewal Note)" (the "Oak Run Third Plat Note" and/or "Note #5006402").

156.    The Oak Run Third Plat Note provides that it is a renewal of a loan dated June 23, 2005 in the amount of $1,100,000.00.

157.    The Oak Run Third Plat Note provides that it is secured by the 2005 Mortgage

  
(the Oak Run Third Plat Mortgage).

158.    The Oak Run Third Plat Note defines "Loan Documents" as "all the documents executed as a part of or in connection with the Loan."

159.    The Oak Run Third Plat Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

160.    The Oak Run Third Plat Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note."

161.    The Oak Run Third Plat Note provides that its maturity date is June 23, 2008.

162.    With respect to the parties, the Oak Run Third Plat Note provides that "[t]he pronouns 'I,' 'me,' and 'my' refer to each Borrower signing this Note, individually and together. 'You' and 'Your' refer to the Lender."

163.    The Oak Run Third Plat Note further provides that "[f]or value received, I promise to pay you or your order, at your address, or at such other location as you may designate, amounts advanced from time to time under the terms of this Note up to the maximum total principal balance of $670,508.70 (Principal) plus interest from the date of disbursement, on the unpaid outstanding Principal balance until this Note is paid in full and you have no further obligations to make advances to me under the Loan."

164.    Concerning default interest, the Oak Run Third Plat Note provides that "[i]f you declare a default under the terms of the Loan, including for failure to pay in full at maturity, you may increase the Interest Rate payable on the outstanding Principal balance of this Note. In such event, interest will accrue Usury Rate [sic]."

165.    Concerning future advances, the Oak Run Third Plat Note provided that "[a]ll

advances made will be made subject to all other terms and conditions of the Loan."

***The June 2009 Change in Terms Agreement for the Oak Run Third Plat Note***

166.    The June 2009 Change in Terms Agreement to the Oak Run Third Plat Note

("2009 CIT to the Oak Run Note") provides that it is intended to change the terms of the June

2005 Note, which as modified became the Oak Run Third Plat Note.

167.    The 2009 CIT to the Oak Run Note defines "indebtedness" as:

> Promissory Note dated June 23, 2005, in the Original Amount of $1,100,000.00,
> with a Current Outstanding Balance of $447,773.70, and all amendments,
> modifications, extensions, renewals, replacements, riders, and substitutions
> thereof.

168.    The 2009 CIT to the Oak Run Note added collateral for the Oak Run Third Plat

Note which included the 2004 Mortgage, the 2005 Mortgage, the June 2006 Mortgage and the

June 2007 Mortgage.

169.    The Tri-Star Parties received no consideration for their agreement to add

collateral to the Oak Run Third Plat Note.

170.    The 2009 CIT to the Oak Run Note also included the following Description of

Change in Terms:

> Extension of maturity date to July 15, 2011, interest rate change from Lender's
> Prime Rate minus .50% to Lender's Prime Rate minus .50%, with a floor of
> 4.75%, payment change, addition of collateral, and addition of covenants.

171.    The Tri-Star Parties received no consideration for these material changes to the

terms of the Oak Run Third Plat Note.

172.    The 2009 CIT to the Oak Run Note also included the following provisions not set

forth in the Oak Run Third Plat Note:

> **MAINTENANCE OF LOAN TO VALUE**.  In order to monitor the Loan to
> Value Ratio requirement, the property may be re-appraised, June 15, 2010, or any
> date thereafter, at the borrowers [sic] expense, as the Bank reserves the right to
> order a new appraisal at the cost of the Borrower should there be any significant

changes in the project's performance or market conditions, including but not limited to:

- The net operating income of the property has decreased
- The lease-up or sell-out of the property has not met the original projections
- The property has had obvious physical changes (fire, wind damage, major renovation, etc.)
- The property continues to remain vacant for an extended period of time
- The highest and best use has changed on an owner-occupied property
- The tax assessment value has declined
- An additional legal or financial burden is placed upon the property, such as the discovery of environmental risk or the creation of an easement
- Market conditions of supply and demand are out of balance
- Investment, capitalization, and discount rates are trending upwards

At the signing of this document, the overall LTV of collateral appraised value to loan amount (Loan Numbers 5006069, 5007096, and 5006402) is 77.86% ($5,530,000.00 appraised value against $4,305,750.00 loan amount). Upon receipt of an updated appraisal, Borrower agrees to an immediate principal and/or commitment reduction or pledge of additional collateral to maintain the original LTV ratio of the loan, using Lender standard LTV ratios.

**RELEASE PROVISION**.
3rd Phase Lots of Oak Run: $38,000.00
4th Phase Lots of Oak Run: $36,000.00
Madison Reserve lots: $36,600.00
1st & 2nd Phase Lots of Oak Run: $33,000.00.

**CURTAILMENTS**. Borrower will make the following minimum cumulative principal payments on the loans, either through lot sales or from other sources, by the following dates:

| | |
|---|---|
| December 1, 2009 | $105,000.00 |
| March 1, 2010 | $210.000.00 |
| June 1, 2010 | $316,000.00 |
| September 1, 2010 | $420,000.00 |
| December 1, 2010 | $525,000.00 |
| March 1, 2011 | $630,000.00 |
| June 1, 2011 | $735,000.00 |

The above principal reduction schedule applies collectively to Loan Numbers 5006805, 5007096, 5006402, and 5006069 with Lender. To the extent of lot sale proceeds, the principal reduction shall apply first to the original applicable loan. All other principal reductions shall apply to the loan(s) specified by Borrower to Lender at the time of payment.

**CONSTRUCTION LOAN FINANCING**. First National Bank of Olathe will

provide construction loans under reasonable terms and conditions adhering to the following schedule.

PRESENT INVENTORY:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 4 Construction Loans |
| Martens Family Enterprises. Inc. | 4 Construction Loans |
| Prieb Homes, Inc. | 2 Construction Loans (To Be Booked) |

Madison Reserve Subdivision
| | |
|---|---|
| Martens. Inc. | 1 Construction Loan |
| Martens Family Enterprises. Inc. | 1 Construction Loan |
| Prieb Homes, Inc. | 1 Construction Loan |

At such time that Martens, Inc. or Martens Family Enterprises, Inc. sell one of the existing properties in Oak Run, a construction loan will be available to Prieb Homes. Inc. in either Oak Run subdivision or Madison Reserve subdivision. At such time that the other "Martens" entity sells one of the existing properties in Oak Run (leaving both Martens with three properties), a construction loan will be available to Prieb Homes, Inc., in the other subdivision that wasn't chosen with the first sale. These replacement of specs as described will enable the inventory to adhere to the following schedule which will be used for the duration of the development loan:

Oak Run Subdivision·
| | |
|---|---|
| Martens, Inc. | 3 Properties |
| Martens Family Enterprises, Inc. | 3 Properties |
| Prieb Homes, Inc. | 3 Properties |

Madison Reserve Subdivision·
| | |
|---|---|
| Martens. Inc. | 1 Property |
| Martens Family Enterprises, Inc. | 1 Property |
| Prieb Homes, Inc. | 1 Property |

173.    The Tri-Star Parties received no consideration for these additional obligations and

provisions that were added to the Oak Run Third Plat Note.

***The 2011 Note and its written provisions.***

174.    On January 15, 2011, the Bank and the Company executed a Note entitled

"Promissory Note" (the "Arbor Creek Note" and/or "Note #5007032").

175.    The Arbor Creek Note provides that it is secured by the April 2007 Mortgage, the

January 2006 Mortgage and the January 2007 Mortgage.

176.   The Arbor Creek Note does not define "Loan Documents" nor does it define "related documents."

177.   The Arbor Creek Note does not define "Note" but defines "Prior Note" as "Promissory Note dated April 10, 2007, in the Original Amount of $1,250,000.00; Promissory Note dated January 17, 2006, in the Original Amount of $1,170,000.00; Promissory Note dated January 19, 2007, in the Original Amount of $640,000.00: and including all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof of any and all of the foregoing described Promissory Notes."

178.   The Arbor Creek Note provides that its maturity date is July 15, 2012.

179.   The Arbor Creek Note further provides that "Tri-Star Development Company, L.L.C. ("Borrower") promises to pay to The First National Bank of Olathe ("FNBO" and/or "Lender"), or order in lawful money of the United States of America, the principal amount of One Million Four Hundred Thirty-five Thousand Nine Hundred Fifty-three & 42/100 Dollars ($1,435,953.42), together with interest on the unpaid principal balance from January 15, 2011, until paid in full."

180.   Concerning default interest, the Arbor Creek Note provides that "Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law."

181.   The Arbor Creek Note makes no provision for future advances.

182.   Many of the provisions of the Notes are ambiguous including without limitation, the conflicting definitions of "Loan Documents," default interest, future advances, related documents and "obligations."  Accordingly, since the Bank prepared the Notes all ambiguities in

the Notes must be construed against the Bank and its successors in interest.

183.   The Arbor Creek Note attempts to memorialize prior loans to the Tri-Star Parties while changing the terms of those prior loans without providing any consideration for those changes.

***The definitions of "Default" under the Notes and the Mortgages are ambiguous.***

184.   The Guaranties repeatedly refer to the word "default" but do not define that term in the documents.

185.   The definition of "Default" under the 2004 Note provides in relevant part:

DEFAULT.  I will be in default if any of the following occur:

A.  Payments. I fail to make a payment in full when due.

B.  Insolvency or Bankruptcy. The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Note or any other obligations I have with you.

C.  Business Termination.  I merge, dissolve, reorganize, end my business or existence, or a partner or majority owner dies or is declared legally incompetent.

D.  Failure to Perform. I fail to perform any condition or to keep any promise or covenant of this Note.

E.  Other Documents. A default occurs under the terms of any other transaction document.

F.  Other Agreements. I am in default on any other debt or agreement I have with you.

G.  Misrepresentation. I make any verbal or written statement or provide any financial information that is untrue, inaccurate or conceals a material fact at the time it is made or provided.

H.  Judgment.  I fail to satisfy or appeal any judgment against me.

I.   Forfeiture.  The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J.   Name Change.  I change my name or assume an additional name without notifying you before making such a change.

K.   Property Transfer.  I transfer all or a substantial part of my money or property.

L.   Property Value.  The value of the Property declines or is impaired.

M.   Material Change. Without first notifying you, there is a material change in my business, including ownership, management, and financial conditions.

N.   Insecurity. You reasonably believe that you are insecure.

186.   The definition of "Default" contained in the Madison Reserve Note provides as

follows:

DEFAULT.  I understand that you may demand payment anytime at your discretion. For example, you may demand payment in full if any of the following occur:

A.   Payments. I fail to make a payment in full when due.

B.   Insolvency or Bankruptcy. The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Note or any other obligations I have with you.

C.   Business Termination. I merge, dissolve, reorganize, end my business or existence, or a partner or majority owner dies or is declared legally incompetent.

D.   Failure to Perform. I fail to perform any condition or to keep any promise or covenant of this Note.

E.   Other Documents.  A default occurs under the terms of any other Loan Document.

F.   Other Agreements. I am in default on any other debt or agreement I have with you.

G.   Misrepresentation.   I make any verbal or written statement or provide any

37

financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

H. Judgment. I fail to satisfy or appeal any judgment against me.

I. Forfeiture. The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J. Name Change. I change my name or assume an additional name without notifying you before making such a change.

K. Property Transfer. I transfer all or a substantial part of my money or property.

L. Property Value. You determine in good faith that the value of the Property has declined or is impaired.

M. Material Change. Without first notifying you, there is a material change in my business, including ownership, management and financial conditions.

N. Insecurity. You determine in good faith that a material adverse change has occurred in my financial condition from the conditions set forth in my most recent financial statement before the date of this Note or that the prospect for payment or performance of the Loan is impaired for any reason.

187.    The Oak Run Fourth Plat Note makes reference to both "default" and the capitalized term "Default," but provides no definition for either term.

188.    The Oak Run Third Plat Note makes reference to both "default" and the capitalized term "Default," but provides no definition for either term.

189.    The definition of "Default" contained in the Arbor Creek Note provides as follows:

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default.  Borrower fails to make any payment when due under this Note.

Other Defaults.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any

loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

False Statements.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Death or Insolvency. The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the Insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any guarantor, endorser, surety or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Insecurity. Lender in good faith believes itself insecure.

190.    The definition of "Default" contained in the January 2006 Mortgage, the June 2006 Mortgage, the January 2007 Mortgage, the April 2007 Mortgage and the June 2007 Mortgage  provide as follows:

39

DEFAULT. Mortgagor will be in default if any of the following occur:

A. **Payments**. Mortgagor fails to make a payment in full when due.

B. **Insolvency or Bankruptcy**. The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

C. **Business Termination.** Mortgagor merges, dissolve, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

D. **Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

E. **Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

F. **Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

G. **Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

H. **Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

I. **Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J. **Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

K. **Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

L. **Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

M. **Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial

conditions.

N. **Insecurity.** Lender determines in good faith that a material adverse change has occurred in my financial condition from the conditions set forth in my most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

191.    The definition of "Default" contained in the 2005 Mortgage is similar to that in the other Mortgages, but states that Mortgagor will be in default if:

N. **Insecurity:**  Lender reasonably believes that Lender is insecure.

192.    The 2004 Mortgage makes reference to "default," but provides no definition for "default" or "Event of Default."

193.    These definitions are ambiguous regarding the definition of "Default" and/or "Events of Default" in that the definitions are conflicting and incongruent.

***The Notes are ambiguous regarding in what order the obligations of the various borrowers will be enforced and collected, and whether "Borrower" refers to individual signatories to each individual Note, or the signatories of all Notes collectively.***

194.    The Notes are ambiguous regarding in what order any Borrower must pay and in what order the Bank or its successors in interest must attempt to collect from any "Borrower."

195.    No conclusions can be reached concerning in what order the Bank or its successors in interest must collect upon the individual Borrowers without resorting to parol evidence.

***The June 8, 2009 Guaranties***

196.    A document titled "Commercial Guaranty" dated June 8, 2009 was executed by "Philip W. Martens" and "Philip Wayne Martens, or the Successors in Trust, Trustee of The Philip Wayne Martens Revocable Living Trust dated February 9, 1989, as amended from time to time" (the "Philip Martens Guaranty").

197.    A document titled "Commercial Guaranty" dated June 8, 2009 was executed by

"David M. Martens" and the "David M. Martens Intervivos Trust Agreement" (the "David Martens Guaranty").

198.    A document titled "Commercial Guaranty" dated June 8, 2009 was executed by "Gregory D. Prieb" and the "Gregory D. Prieb Intervivos Trust Agreement UTA" (the "Prieb Guaranty").

***No consideration was given for the guaranties.***

199.    The Loan Documents do not provide that any of the Guaranties were given as consideration for the Notes.

200.    The Bank obtained separate guaranty agreements from various of the Tri-Star Parties in 2004, 2005, 2006 and 2007.

201.    On their face and when read together, the guaranty agreements are ambiguous concerning how the guarantors are jointly and severally liable.

202.    Some of the past guaranties are missing material terms and are therefore unenforceable on their face.

203.    On their face and when read together, the guaranty agreements are ambiguous concerning whether the Bank, or its successors in interest, can enforce the guaranties without first having sought to foreclose the collateral that secures the guaranties and the mortgages in this matter.

204.    The 2009 Guaranties are unenforceable because no consideration was given for those agreements for various reasons, including the Bank's prior procurement of guaranties from the Tri-Star Parties on numerous occasions prior to 2009.

205.    The waiver provisions of the various guaranty agreements are unenforceable on their face.

***The terms and conditions of the Guaranties prepared by the Bank in June 2009.***

206.    The Bank claims that on June 8, 2009, "Philip W. Martens" and "Philip Wayne Martens, or the Successors in Trust, Trustee of The Philip Wayne Martens Revocable Living Trust dated February 9, 1989, as amended from time to time" executed the Philip Martens Guaranty.

207.    The Philip Martens Guaranty defines "Guarantor" as "Philip W. Martens" and "Philip Wayne Martens, or the Successors in Trust, Trustee of The Philip Wayne Martens Revocable Living Trust dated February 9, 1989, as amended from time to time"

208.    The Bank claims that on June 8, 2009, "David M. Martens" and the "David M. Martens Intervivos Trust Agreement" executed the David Martens Guaranty.

209.    The David Martens Guaranty defines "Guarantor" as "David M. Martens" and the "David M. Martens Intervivos Trust Agreement"

210.    The Bank claims that on June 8, 2009, "Gregory D. Prieb" and the "Gregory D. Prieb Intervivos Trust Agreement UTA" executed the Prieb Guaranty.

211.    The Prieb Guaranty defines "Guarantor" as "Gregory D. Prieb" and the "Gregory D. Prieb Intervivos Trust Agreement UTA."

212.    Collectively the Philip Martens Guaranty, the David Martens Guaranty and the Prieb Guaranty are referred to hereafter as the "Guaranties."

213.    Each of the Guaranties separately provides that "Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of Guarantor's Share of the Indebtedness of Borrower to Lender, and Guarantor's share of the performance and discharge of all Borrower's obligations under the Note and the Related Documents."

214.    The Guaranties then go on to place numerous "conditions" upon the "Guarantor" and the terms of repayment by the "Guarantor" thus creating ambiguity in the Guaranties.

215.    Many references to the term, "obligations" in the Guaranties are not capitalized

and the Guaranties include both the defined term "Obligation" and the general term obligations.

216.    The Guaranties contain conflicting and ambiguous language as to whether they guaranty repayment of the indebtedness on one note, more than one note or all five notes executed by the Borrower and the Bank.

***The Notes, the Mortgages, and the Guaranties are ambiguous concerning the definition of "Loan Documents".***

217.    The 2004 Note does not define "Loan Documents."

218.    The 2004 Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

219.    The Madison Reserve Note defines "Loan Documents" as "all the documents executed as a part of or in connection with the Loan."

220.    The Madison Reserve Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

221.    The Madison Reserve Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note."

222.    The Oak Run Fourth Plat Note defines "Loan Documents" as "all the documents executed as a part of or in connection with the Loan."

223.    The Oak Run Fourth Plat Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

224.    The Oak Run Fourth Plat Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this

Note."

225.    The Oak Run Third Plat Note defines "Loan Documents" as "all the documents executed as a part of or in connection with the Loan."

226.    The Oak Run Third Plat Note defines "Note" as "this document, and any extensions, renewals, modifications and substitutions of this Note."

227.    The Oak Run Third Plat Note defines "Loan" as "this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note."

228.    The Arbor Creek Note does not define "Loan Documents" nor does it define "related documents."

229.    The Arbor Creek Note does not define "Note" but defines "Prior Note" as "Promissory Note dated April 10, 2007, in the Original Amount of $1,250,000.00; Promissory Note dated January 17, 2006, in the Original Amount of $1,170,000.00; Promissory Note dated January 19, 2007, in the Original Amount of $640,000.00: and including all amendments, modifications, extensions, renewals, replacements, riders, and substitutions thereof of any and all of the foregoing described Promissory Notes."

230.    The Notes do not define the term "Related Documents."

231.    The Mortgages do not define the terms "Loan Documents" or "Related Documents."

232.    The Mortgages frequently mention "other document[s] relating to the Secured Debts," but fail to define such term.

233.    The Guaranties do not define the term "Loan Documents."

234.    The Guaranties define the term "Related Documents" as "all promissory notes,

credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

235.    The definitions in the Notes, the Mortgages, and the Guaranties are ambiguous regarding the definition of "Loan Documents" and "Related Documents."

***The Guaranties are ambiguous regarding "who" all the "Guarantors" are.***

236.    The Philip Martens Guaranty defines "Guarantor" as "Philip W. Martens" and "Philip Wayne Martens, or the Successors in Trust, Trustee of The Philip Wayne Martens Revocable Living Trust dated February 9, 1989, as amended from time to time."

237.    The David Martens Guaranty defines "Guarantor" as "David M. Martens" and the "David M. Martens Intervivos Trust Agreement"

238.    The Prieb Guaranty defines "Guarantor" as "Gregory D. Prieb" and the "Gregory D. Prieb Intervivos Trust Agreement UTA."

239.    The Bank requested three separate guaranties to be signed by the Guarantors.

240.    The 2009 Guaranties are ambiguous concerning who all of the Gurantors are in that it is unclear whether this phrase means that:  "David M. Martens" and the "David M. Martens Intervivos Trust Agreement" were the only "Guarantors" because they were the only persons that signed the David Martens Guaranty, or whether the Guarantors include other guaranty agreements signed by other persons or entities such as Gregory Prieb and/or Philip Martens.

241.    All of the Guaranties suffer from the same ambiguity of who all of the Guarantors are and whether the Guaranties include each individual guaranty or whether that phrase means all of the Guarantors signing any of the other alleged Guaranties.

242. All ambiguities must be construed against the Bank or its successors in interest, in that it prepared the Guaranties.

243. No conclusions can be reached concerning who "all Guarantors" are without resorting to parol evidence.

***The guaranties are ambiguous regarding in what order the guaranties will be enforced and collected, and whether "any guarantor" refers to signatories to the individual guaranties, or all of the guaranties collectively.***

244. The Guaranties are ambiguous regarding in what order any guarantor must pay and in what order the Bank, or its successors in interest, must attempt to collect from any "Guarantor."

245. No conclusions can be reached concerning who all of the Guarantors are and in what order they will be collected without resorting to parol evidence.

***The Guaranties are ambiguous as to joint and several liability.***

246. The Guaranties provides that

GUARANTOR'S SHARE OF THE INDEBTEDNESS. The words "Guarantor's Share of the Indebtedness" as used in this Guaranty mean 33.000% of all the principal amount, interest thereon to the extent not prohibited by law, and all collection costs, expenses and attorneys' fees whether or not there is a lawsuit, and if there is a lawsuit, any fees and costs for trial and appeals. The 33.000% is the collective share of all Guarantors signing below (i.e., not 33.000% for each Guarantor signing below).

Lender shall determine Guarantor's Share of the Indebtedness when Lender makes demand on Guarantor. After a determination, Guarantor's Share of the Indebtedness will only be reduced by sums actually paid by Guarantor under this Guaranty, but will not be reduced by sums from any other source including, but not limited to, sums realized from any collateral securing the indebtedness or this Guaranty, or payments by anyone other than Guarantor, or reductions by operation of law, judicial order or equitable principles. Lender has the sole and absolute discretion to determine how sums shall be applied among guaranties of the Indebtedness. Notwithstanding the foregoing, Lender shall not be entitled to receive payments from multiple sources that exceed in the aggregate more than the outstanding indebtedness and collection costs.

The above limitation on liability is not a restriction on the amount of the Note of

47

Borrower to Lender either in the aggregate or at any one time.

247.     The Guaranties are ambiguous concerning joint and several liability when more than one guaranty document is to be signed and only makes provision for joint and several liability in the event that more than one person signs the individual Guaranty document.

248.     All of the Guaranties suffer from the same flawed description of "joint and several liability."

249.     No conclusions can be reached concerning "joint and several liability" without resorting to parol evidence.

***The guaranties purport to allow the Bank to collect the alleged indebtedness more than once.***

250.     The guaranties relied upon by the Bank, or its successors in interest, purport to permit the Bank to pursue double and triple recovery of the indebtedness.  The David Martens Guaranty, the Phillip Martens Guaranty and the Prieb Guaranty all state that a "Guarantor's Share of the Indebtedness will only be reduced by sums actually paid by Guarantor under his Guaranty."   Accordingly, as a result of the claims now being asserted by the Bank or its successors in interest, unless David Martens, Phillip Martens, or Greg Prieb individually pays the full amount of his Guaranty plus default interest and attorneys' fees, his respective Guaranty purportedly remains enforceable by the Bank or its successors in interest.

251.     The loan documents on which the Bank has sued allegedly prohibit the Guarantors from crediting payments received from the Borrower or from foreclosure of the Property to amounts owed by the Guarantors under their alleged Guaranties.

***The guaranties are ambiguous as to the Guarantors' remedies and defenses.***

252.     The Guaranties provide that:

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice

of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to pursue any other remedy within Lender's power; or (F) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness.  If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

253.    The Guaranties make no provision for the waiver of any defense based upon Guarantor failing to approve extensions of the Notes after they are fully matured, or the impairment by the Bank, or its successors in interest, of any of the Guarantors rights to

49

contribution against the Company or any other guarantor.

254.    The Guaranties make no provision for the waiver of any rights to require the Bank, or its successors in interest, to first proceed against security or collateral for the Guaranties.

255.    The Guaranties make no provision for the waiver of any rights to require the Bank, or its successors in interest, to first proceed against security or collateral <u>not</u> held by the Bank.

256.    Many of these provisions of the Guaranties are ambiguous in view of the many varied provisions of the different loan documents.

257.    Many of these provisions are ambiguous when construed in light of the provisions of the Notes.

258.    Nothing in the Guaranties provides any waiver by a Guarantor regarding any "renewals" to the Notes after they have matured.

259.    All of the Guaranties suffer from the same flawed provisions described herein.

260.    No conclusions can be reached concerning the consents given without resorting to parol evidence.

***The purported waiver provisions of the guaranty are unenforceable.***

261.    The Guaranties provide in indistinguishable, ten-point type, buried in the middle of the document the alleged waivers by the "Guarantor" to the Bank or its successors in interest.

262.    The manner in which the alleged waiver provisions of the Guaranties are set out does not comply with the requirement for waivers under the law in that they are not set off in a distinct way, either in bold face print, all capitalized letters, or larger print that would make them distinct from the remainder of the document.

263.    Any assertions by the Bank or its successors in interest that any Guarantor could

waive claims for reckless or intentional conduct by the Bank or its successors in interest are unenforceable as a matter of law.

***The Bank's refusal to support a builder program and structure the financing in a way to promote success of the project.***

264.    After the Bank requested the Notes and the 2009 Guaranties related to the projects, the Bank approached the Company concerning other changes to the transactions.

265.    The Tri-Star Parties then requested the Bank's participation in various activities implicit in causing the continued success of the project.

266.    The Bank, and subsequently its successors in interest, refused to cooperate in any such activities or to address any of the concerns of the Tri-Star Parties.

267.    In view of the Bank's and its successors in interest's unwillingness to participate in any effort to cause the project to succeed, the Company offered to the Bank and its successors in interest the land and lots comprising the project in order to pay any and all outstanding amounts claimed due from the Company.

268.    The Bank and subsequently its successors in interest refused to accept the property from Plaintiffs and instead commenced litigation against the Tri-Star Parties.

***The Bank's failure to mitigate its damages, if any.***

269.    Prior to any initiation of litigation by the Bank, the Tri-Star Parties offered to return the property that was collateral for the Notes to the Bank.

270.    The Bank, and subsequently its successors in interest, refused to accept the collateral, and thus, to mitigate its damages, if any, and instead the Bank and its successors in interest have chosen to incur needless attorneys' fees and expenses and assert claims of default interest.

***Ambiguous provisions of the Mortgages relating to foreclosure of the property and against whom remedies upon default may be obtained.***

271.    The Mortgages also state that "Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts."

272.    Under each of the Mortgages, one of the Bank's remedies was to "foreclose this Security Interest in a manner provided by law upon the occurrence of a default or anytime thereafter."

273.    Because the Mortgages and other Loan Documents fail to define "documents relating to the Secured Debts," the Mortgages and the other Loan Documents are ambiguous concerning against whom remedies upon default may be obtained.

274.    Moreover, if remedies may be obtained against the Borrower and the Guarantors, the Mortgages are silent on whether that liability is joint, several, or joint and several.

275.    The Bank prepared the Mortgages and the Loan Documents and all ambiguities in the Mortgages must be construed against the Bank or its successors in interest.

276.    All of the documents suffer from the same ambiguity concerning against whom remedies may be obtained.

277.    No conclusions can be reached concerning these matters without resorting to parol evidence.

278.    These terms and provisions were ambiguous concerning what, in fact, was intended by the parties concerning against whom remedies upon default may be obtained.

279.    All such language must be strictly and narrowly construed against the Bank and in favor of Tri-Star.

***The Bank's failure to act in good faith and deal fairly with Plaintiffs.***

280.    The duty of good faith and fair dealing prohibits a party from intentionally and purposefully doing anything to prevent the other party from carrying out his or her part of the

agreement, or from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

281.    The Bank and its successors in interest breached the duty of good faith in several respects throughout this transaction, including intentionally deceiving the Tri-Star Parties to sign renewal and modification documents that materially altered the terms of the original loan documents.

282.    The renewal and modification documents materially altered the terms of the original loan documents by, among other things, changing the standard interest rates, requiring additional collateral, imposing loan-to-value covenants not included in the prior loan documents, and imposing other new and additional obligations upon the Tri-Star Parties.

283.    Moreover, good faith is "honesty in fact in the conduct or transaction concerned." Good faith also includes "honesty in fact in the observance of reasonable commercial standards of fair dealing in the trade."  Finally, good faith means:

> Good faith in performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness, or reasonableness."

284.    The Bank's and its successors in interest's actions against the Tri-Star Parties constitute a clear breach of its duty of good faith and fair dealing.

285.    The Bank and its successors in interest did not exhibit honesty in fact, did not observe "reasonable commercial standards" and did not act consistently "with the justified expectations of the other party."

286.    The Bank's actions specifically involved "bad faith", and included fraudulent misstatements.   The Bank's actions violated community standards of decency, fairness, and reasonableness.

287.    The officers and directors at the Bank that were making decisions as it relates to the Tri-Star Parties apparently made decisions to declare a default and accelerate payment without reviewing the Loan Documents.

288.    This is despite the fact that the officers and directors who were making decisions for the Bank, or its successors in interest, had to fulfill the obligations the Bank had to the customer including the obligation to deal with the customer in good faith.

289.    The officers and directors of the Bank, or its successors in interest, knew that they must make sure that the Bank was proceeding consistent with their representations, the written documents that the Bank had with the Tri-Star Parties in order to be sure that the Bank actions were consistent with those representations and those written agreements before the Bank would declare a default against the Plaintiffs.

290.    The officers and directors of the Bank, or its successors in interest, knew that the Bank had a general practice of the way it would pursue declaring a default including how the Bank should proceed before it ever declared a default and accelerated payment with one of the Bank's customers.

291.    Those procedures included the Bank's confirmation that, in fact, the Bank itself, and its successors in interest, were not in default under the agreements with its customer.

292.    The Bank told the Tri-Star Parties that the Tri-Star Parties could rely on the Bank to conduct its business with the highest standards of honesty and fairness.

293.    The Bank openly advertised how the Bank supported this key initiative of subscribing to these high standards.

54

294.    The Bank openly told the Tri-Star Parties that it believed it had a "trusted" relationship with the Tri-Star Parties as one of its key customers and this was part of the Bank's policy.

295.    The Bank's high standards included complying with the spirit of the law as well as the letter of the law.

296.    The Bank openly told the Tri-Star Parties that it believed it had a fiduciary relationship with the Tri-Star Parties as one of its key customers and this was part of the Bank's policy.

297.    The Bank openly promoted its honesty and ease with which the Tri-Star Parties could deal with the Bank on a daily basis, including that the Bank and its successors in interest would never make any false or misleading statements to the Tri-Star Parties.

298.    The actions of the Bank and its successors in interest specifically involved "bad faith", and included fraudulent misstatements.

299.    The Bank represented that it would fund construction loans under certain defined terms, with knowledge that it could not fund construction loans under those terms.

300.    The Bank's fraudulent nondisclosures included its failure to inform the Tri-Star Parties that it would materially change the prior agreements between the parties (executed between 2004 and 2009) based on the Bank's internal loan-to-value policies.

301.    The Bank's fraudulent nondisclosures included its failure, prior to 2009, to inform the Tri-Star Parties that if the Bank's undisclosed loan-to-value policy was out of compliance, that the Bank would proceed to obtain annual appraisals for the properties at issue in this litigation and would additionally request the execution of new loan documents with the Tri-Star Parties that contained materially different terms from the loan documents executed by the parties between 2004 and 2009.

55

302.    The Bank's fraudulent nondisclosures included its failure to inform the Tri-Star Parties that if the Bank's undisclosed loan-to-value policy was out of compliance, that the Bank would require the cross-collateralization of the properties that secured all of the Notes at issue in this litigation.

303.    The Bank's fraudulent nondisclosures included its failure to inform the Tri-Star Parties that if the Bank's undisclosed loan-to-value policy was out of compliance, that the Bank would require the Tri-Star Parties to provide additional collateral to secure new loan documents, including the addition of collateral that was, at the time, owned free and clear by the Tri-Star Parties.

304.    The Bank's fraudulent nondisclosures included its failure to inform the Tri-Star Parties that if the Bank's undisclosed loan-to-value policy was out of compliance, that the Bank would require the Tri-Star Parties to agree to new terms under the loan documents including interest rate changes, changes in collateral and "additional covenants."

305.    The Bank, by way of its fraudulent nondisclosures and other bad acts, induced the Tri-Star Parties to invest millions of dollars in the Projects, monies that were not taken from loan proceeds disbursed by the Bank.

306.    The Bank's actions violated community standards of decency, fairness, and reasonableness.

***Course of dealing and course of performance.***

307.    From 2004 through 2011, the Tri-Star Parties and the Bank created a "course of dealing."

308.    During the period 2004 through 2011, following execution of the various agreements, the Tri-Star Parties and the Bank further established a course of performance.

***The Bank breached the agreements with the Tri-Star Parties first.***

309.    In order for the Bank or its successors to prevail on their claim of default by the Tri-Star Parties, the Bank and its successors in interest  must themselves have substantially complied with and not materially breached the terms of the agreements.  A breach is "material" if "it operates to prevent the duty of the other party to perform from becoming due."

310.    The actions of the Bank and its successors in interest materially impacted the Tri-Star Parties' ability to perform under the agreements with the Bank.

311.    The Tri-Star Parties, at the request of the Bank, invested substantial sums of money into the development and construction projects at issue in this case and maintained the properties while they appreciated.

312.    The Bank and its successors in interest cannot breach the agreements with the Tri-Star Parties, interfere with the Plaintiffs' and the Company's performance, and then declare a default so as to enable it to sue the Plaintiffs for money.  The material breach committed by the Bank and its successors in interest excused the Tri-Star Parties of their performance under the agreements.

313.    The Bank and its successors in interest breached its contracts and agreements with the Tri-Star Parties by intentionally deceiving the Tri-Star Parties into signing the following loan documents:

•    The 2004 Note, Mortgage and Guaranties executed by the Tri-Star Parties and the Bank.

•    All of the 2004, 2005, 2006, 2007, 2008, 2009 and 2011 loan documents, including the Notes, the Mortgages, Debt Modification Agreements, Change in Terms Agreements and Commercial Guaranties.

•    The 2005 Construction Loan Agreement executed by Tri-Star Development Company, LLC and the Bank.

•    The 2007 Construction Loan Agreement executed by Tri-Star Development Company, LLC and the Bank.

- The guaranty of completion contained within the 2007 Debt Modification Agreement between the parties.

314.    Moreover, the breaches by the Bank and its successors in interest include their breach of the implied duty of good faith and fair dealing, which was implicit in all of the agreements executed between the parties between 2004 and 2011.

315.    In this case, when the Bank and its successors in interest materially breached the Guaranties, the Notes, and the other loan documents, the Tri-Star Parties were immediately entitled to suspend all of their performance under all of the agreements while Defendants' breach remained uncured.

316.    Moreover, as the first party in material breach of the contract, the Bank and its successors in interest also lost their right to enforce any of the provisions of the agreements.  The Bank and its successors in interest, therefore, cannot assert or rely upon any alleged breaches committed by the Tri-Star Parties.  The "first to breach" rule precludes, for example, all of the Defendants' claims that the Plaintiffs breached any agreement because they failed to pay all of obligations of the Company.

317.    The breaches committed by the Bank and its successors in interest prevented the Tri-Star Parties from recouping their nearly $4 million investment in the various Projects.

***Fiduciary duties of the Bank and Its Successors in Interest.***

318.    "A fiduciary relation does not depend upon some technical relation created by, or defined in, law.  It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

319.    Some of the indicia of a fiduciary relationship include: (1) the acting of one person for another; (2) the having and exercising of influence over one person by another; (3) the

reposing of confidence by one person in another; (4) the dominance of one person by another; (5) the inequality of the parties; (6) and dependence of one person upon another.  In addition, courts have considered weakness of age, mental strength, business intelligence, knowledge of the facts involved or other conditions giving to one an advantage over the other.

320.     A fiduciary relationship may arise in situations in which "the bank had dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer, in some instances the bank stood to profit from non-disclosure to the customer."

321.     If a bank exerts control over certain aspects of a person's business and recommends a course of action which results in the bank's own benefit, then the bank becomes a fiduciary.

322.     Moreover, "[w]here one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he would not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation [in essence, fiduciary] to speak, and his silence constitutes fraud."

323.     The Tri-Star Parties had a long-standing relationship with the Bank for many years prior to 2009, dating back to at least 1978, during which the Bank served as the primary lender for certain of the Tri-Star Parties.

324.     The Bank had superior knowledge of its own financial condition, the regulatory scheme that they were under, and the Bank's own capital structure.  The Bank and its successors in interest never disclosed any of this information to the Tri-Star Parties and how it would impact the Bank's and its successors in interest's ability to perform, but enticed the Tri-Star Parties to sign documents.

325.    None of the actions by the Bank and its successors in interest can be reconciled with the standard of "faithfulness to an agreed common purpose" and "justified expectations" of the Tri-Star Parties.  The actions of the Bank and its successors in interest against the Tri-Star Parties, with whom it had had a mutually agreeable and profitable relationship, constitute a clear breach of its duty of good faith and fair dealing.  The Bank and its successors in interest did not exhibit honesty in fact, did not observe "reasonable commercial standards" and did not act consistently "with the justified expectations of the other party."

326.    The actions of the Bank and its successors in interest specifically involved "bad faith", and included fraudulent misrepresentations.  The actions of the Bank and its successors in interest violated community standards of decency, fairness, and reasonableness.

327.    Upon information and belief, the Bank was under memorandums of understanding with state and federal regulators regarding its ability to make construction loans at the time it made various promises to the Tri-Star concerning construction loans and those promises were inconsistent with the regulatory scheme the Bank was under.

328.    The Bank failed to disclose its financial condition and that its financial condition would require it to deviate from and alter its original commitments under the various loan documents executed by the parties between 2004 and 2011, including the inability of the Bank and its successors in interest to meet its obligations pursuant to the prior Construction Loan Agreements executed by the parties and the obligations of the Bank and its successors in interest under the 2009 Change in Terms Agreements.

329.    The Bank failed to disclose its financial condition and that its financial condition and the regulatory mandates it was under would require it to deviate from its prior promises and agreements and alter its prior agreements relating to collateral needed to secure the loans, interest rates for the loans and various other additional covenants under the loans.

*Other tortious actions.*

330.     The Bank and its successors in interest tortiously interfered with the Tri-Star Parties' contractual relations with its venders, homebuilders and other lenders.  The actions of the Bank and its successors in interest in filing suit against the Tri-Star Parties and continuing to litigate this matter were intended to trigger default provisions in other loan transactions involving the Tri-Star Parties.

331.     The Bank and its successors in interest acted with requisite intent.  Moreover, the Bank and its successors in interest were clearly acting with an improper motive.

332.     The Tri-Star Parties had contracts and valid business relationships including builders interested in buying lots from the Plaintiffs in various projects.  The Tri-Star Parties also had numerous relationships with venders and others who performed work on projects for the Tri-Star Parties.  The  Tri-Star Parties also had numerous lending relationships, and the Bank and its successors in interest were clearly aware of all these relationships.

333.     The Bank and its successors in interest created an environment in which it became very difficult for the Tri-Star Parties' marketing and sales efforts to sell portions of the project.

334.     As set forth in more detail elsewhere, the Bank and its successors in interest engaged in numerous independently tortious and wrongful acts to accomplish its purpose, including suing the Plaintiffs which was both intentional and improperly motivated.

*Malicious intent to harm the Tri-Star Parties.*

335.     The Bank and its successors in interest, through their officers and directors, undertook intentional actions with the specific intent to injure the Tri-Star Parties.

336.     There was no justification for the Bank and its successors in interest, their officers' and directors' actions.  They knew the serious harm that would result to the Tri-Star Parties, and acted with malice.

***The Bank fraudulently induced the Tri-Star Parties to sign documents.***

337.   As set out herein, the Bank committed both fraudulent and negligent misrepresentations.[2]

338.   The Bank was clearly acting with an improper motive.

339.   Further, as set forth in more detail elsewhere, the Bank engaged in numerous independently tortious and wrongful acts to accomplish its purpose.

340.   The filing of suit against the Plaintiffs and not accepting the property offered by the Company was both intentional and improperly motivated by naming the Tri-Star Parties as defendants in a publicly filed suit.

341.   The Bank also engaged in numerous misrepresentations and misstatements to the Tri-Star Parties, including, without limitation, the fraudulent statements made to induce the Tri-Star Parties to sign papers.

342.   The Bank and its successors in interest not only intentionally interfered with the Tri-Star Parties' business expectancy, but did so for a wrongful and improper motive, and utilized independently wrongful and fraudulent means.

343.   The Bank encouraged the Tri-Star Parties to repose special trust and confidence in its advice.  The Bank and its successors in interest took actions which directly benefited the Bank and its successors in interest and harmed the Tri-Star Parties despite the trust placed in the Bank and the long term relationship and course of dealing with the Bank.

## COUNT I
(Breach of Contract against the Bank)

344.   The Tri-Star Parties incorporate the allegations contained in paragraphs 1 through 343 as if fully set forth herein.

---

[2]   The examples set forth herein of transactions involving the Bank's fraud, negligent misrepresentation, breach of contract, etc. are not intended to be exhaustive only illustrative.

345.    The Tri-Star Parties and the Bank entered into agreements wherein the Bank agreed to fund expenses for the projects as set out above.

346.    The Tri-Star Parties performed and are prepared to perform under the terms of the agreements.

347.    The Bank and its successors in interest have failed to perform under the terms of the agreements.

348.    The Tri-Star Parties have been damaged by the breaches of the agreements committed by the Bank and its successors in interest.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC pray this Court for a judgment against the Bank and its successors in interest in an amount in excess of $75,000, the exact amount to be proved at trial; for prejudgment interest and post-judgment interest as provided by law; for the Tri-Star Parties' costs and expenses incurred herein including attorneys' fees; and for any and all other relief that this Court deems just and proper.

## COUNT II
(Promissory Estoppel against the Bank)

349.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 348 as if fully set forth herein.

350.    As set out herein the Tri-Star Parties and the Bank reached agreements which had clear and definitive terms to, among other things, fund the expenditures of the projects secured by collateral provided by the Company.

351.    The Tri-Star Parties reasonably relied upon the Bank's representations that the agreements were reached and that the Bank would advance funds under said agreements to pay

the expenses of the projects, and not breach the agreements by declaring a default based on false statements.

352.    The equities support the enforcement of the agreements.

353.    The Tri-Star Parties will suffer damages and an injustice will result if the Bank's representations and promises are not enforced and the Bank and its successors in interest are allowed to repudiate the representations and promises to the Tri-Star Parties.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC request that the Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest in an amount in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for the Tri-Star Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT III
(Declaratory Judgment against the Bank)

354.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 353 as if fully set forth herein.

355.    The Tri-Star Parties, at the request of the Bank, signed documents prepared by the Bank generally purporting to be and described as the Notes, the Mortgages, and the Guaranties.

356.    The Bank used fraudulent means to obtain these documents signed by the Tri-Star Parties.

357.    None of the documents purporting to be the Notes, the Mortgages, the Change in Terms Agreements and the Guaranties, including without limitation those identified herein, are

enforceable security agreements, notes, mortgages, and guaranties binding the Tri-Star Parties, including without limitation any alleged default provisions or acceleration provisions.

358.    The Tri-Star Parties and the Bank entered into the various loan documents based on the Bank's representations to the Tri-Star Parties, which the Bank intended that the Tri-Star Parties rely upon as set out herein.

359.    The Bank knew that statements it made were false and other statements identified herein were false, and intended to deceive the Tri-Star Parties in order to induce the Tri-Star Parties to enter into the agreements.

360.    Further, the Bank in order to induce the Tri-Star Parties to take actions as more fully set out herein either falsely represented or failed to disclose material information to the Tri-Star Parties.

361.    The Tri-Star Parties signed documents to accommodate the Bank, based on the Bank's material representations and failure to disclose material information.

362.    As a result of the actions of the Bank and its successors in interest, set out herein, the agreements are void or voidable.

363.    The Bank was the first party to materially breach the agreements with the Tri-Star Parties.

364.    As a result of the Bank being the first party to materially breach the agreements, the Tri-Star Parties were entitled to suspend performance and/or terminate any further performance while the breach remains uncured and damages have not been paid.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC pray this Court for a declaratory judgment including, without limitation, a finding that the Notes, the Mortgages, and the Guaranties are void or voidable; for a

declaratory judgment finding that the Bank was the first party to materially breach the agreements with the Tri-Star Parties; for declaratory judgment that the Notes and the Guaranties are not enforceable; that as a result of the Bank being the first party to materially breach the agreements, the Tri-Star Parties were entitled to suspend performance and/or terminate any further performance while the breach remains uncured and damages have not been paid; for the Tri-Star Parties' costs and expenses incurred herein including their attorneys' fees; and for such other and further relief as this Court deems just and proper.

## COUNT IV
### (Unclean Hands)

365.    The Tri-Star Parties incorporate by reference each and every allegation set forth in paragraphs 1 through 364 as if fully set out herein.

366.    The Bank's conduct and the conduct of its successors in interest was fraudulent and unconscionable.

367.    The Bank and its successors in interest, by their actions, misrepresentations and false promises are guilty of inequitable conduct and therefore, may not obtain the relief they seek in this action.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC  pray this Court for a declaratory judgment finding that the Notes, the Mortgages, and the Guaranties are void or voidable; for the Tri-Star Parties' costs and expenses incurred herein including their attorneys' fees; and for such other and further relief as this Court deems just and proper.

## COUNT V
### (Fraudulent Nondisclosure against the Bank)

66

368.    The Tri-Star Parties incorporate the allegations contained in paragraphs 1 through 367 as if fully set forth herein.

369.    Throughout the development of the project, a relationship existed of trust and confidence between the Tri-Star and the Bank on the subject of the Tri-Star Parties' ownership of the Projects which gave rise to a duty of disclosure by the Bank and its successors in interest.

370.    While such relationship existed, the Bank and its successors in interest failed to disclose material information to the Tri-Star Parties including that information set out herein.

371.    All of these undisclosed matters were material to the Tri-Star Parties.

372.    The Bank for the purpose of inducing the Tri-Star Parties to obtain financing from the Bank and intending that the Tri-Star Parties would rely upon the Bank's failure to disclose adverse facts regarding the Bank's business represented to the Tri-Star Parties that it wanted the Tri-Star Parties' business and desired that the Tri-Star Parties borrow money from the Bank to the exclusion of other lenders with which the Tri-Star Parties had relationships.

373.    The Bank knowingly failed to make the disclosures.

374.    The Bank intended to deceive the Tri-Star Parties by withholding the information.

375.    The Tri-Star Parties acted in reliance on the Bank's failure to disclose, and the Tri-Star Parties were justified in such reliance.

376.    As a direct and proximate result of the Bank's failure to disclose material information, the Tri-Star Parties have incurred damages.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC request that this Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest in the amount of their damages as established by the evidence, which are in excess of $75,000.00; for pre-judgment interest and

post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VI
(Breach of the Duty of Good Faith and Fair Dealing against the Bank)

377.    The Tri-Star Parties  incorporate the allegations of paragraphs 1 through 376 as if fully set forth herein.

378.    The Tri-Star Parties entered into certain agreements with the Bank as more fully set out herein.

379.    In connection with said agreements entered into by the Bank and the Tri-Star Parties, the Bank and its successors in interest had a duty to act in good faith and deal fairly in the performance and enforcement of all said agreements.

380.    Among other things, the Bank and its successors in interest engaged in actions which are set out in detail above.

381.    Contrary to the representations made by the Bank, it breached its duty of good faith and fair dealing by, among other things, engaging in the conduct described herein.

382.    As a direct result of the breach of the duty of good faith and fair dealing committed by the Bank and its successors in interest, the Tri-Star Parties have been damaged.

WHERERFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC respectfully request that the Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for the Tri-Star Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VII
(Breach of Fiduciary Duty against the Bank)

383.     The Tri-Star Parties incorporate the allegations of paragraphs 1 through 382 as if fully set forth herein.

384.     Throughout the relationship between the Tri-Star Parties and the Bank, a fiduciary relationship existed between the Tri-Star Parties and the Bank of trust and confidence on the subject of the Tri-Star Parties' completion of projects.

385.     The Bank and its successors in interest were under a duty to act for the benefit of the Tri-Star Parties in that the Bank and its successors in interest were required not to take actions which directly benefited the Bank and its successors in interest and harmed the Tri-Star Parties including without limitation those set out herein.

386.     The Tri-Star Parties placed confidence in the Bank, and the Bank exercised domination and influence over the Tri-Star Parties and its business.

387.     The confidence that the Tri-Star Parties placed in the Bank was used by the Bank and its successors in interest in an effort to dominate the Tri-Star Parties' businesses.

388.     By these actions and inactions, the Bank and its successors in interest breached their fiduciary duty to the Tri-Star Parties and as a result of the Bank's reckless, wanton and malicious conduct, the Tri-Star Parties request damages.

389.     The breach of these fiduciary duties is the proximate cause of damage to the Tri-Star Parties.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC request that this Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest in an amount that is fair and reasonable

69

in excess of $75,000; for pre-judgment interest and post-judgment interest as provided by law; for the Tri-Star Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT VIII
### (Tortious Interference with Contracts and Business Expectancy)

390.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 389 as if fully set forth.

391.    Contracts and business relationships existed between the Tri-Star Parties and a number of third parties including, without limitation subcontractors, local realtors, the Tri-Star Parties' real estate company and purchasers of the Tri-Star Parties' property, and as a result, the Tri-Star Parties had an expectancy of profiting from the projects.  A loss of the expected benefits has occurred and profits from these projects have not been obtained by the Tri-Star Parties as a result of the actions by the Bank and its successors in interest.

392.    The Bank had knowledge of the Tri-Star Parties' contracts, business relationships, and expectancy of profiting from the projects.

393.    The Bank's actions and the actions of its successors in interest were intentional, improperly interfered with the Tri-Star Parties' business relationships, contracts, and expectancy of profiting from the projects and were without justification or excuse and as a result of the reckless, wanton and malicious conduct by the Bank and its successors in interest, the Tri-Star Parties request damages.

394.    The Tri-Star Parties have been damaged by the Bank's actions and the actions of the Bank's successors in interest.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star

Development Company, LLC request that this Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest for such damages as are fair and reasonable in excess of $75,000, the exact amount to be proved at trial; for prejudgment and post-judgment interest as provided by law; for the Tri-Star Parties' costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT IX
(Negligent and Malicious Breach of Contract against the Bank)

395.    Tri-Star Development Company, LLC incorporates the allegations of paragraphs 1 through 394 as if fully set forth herein.

396.    The Bank and its successors in interest, by virtue of agreements with the Tri-Star Parties, undertook certain duties to the Tri-Star Parties including fiduciary duties in acting as a trusted financial resource.

397.    The duties undertaken by the Bank and its successors in interest include without limitation those set out above.

398.    The Bank and its successors in interest negligently and recklessly failed to perform their duties under agreements with the Tri-Star Parties and as a result of the Bank's reckless, wanton and malicious conduct, the Tri-Star Parties request damages.

399.    As a direct result of the Bank's actions and inactions, the Tri-Star Parties have been damaged.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC request that this Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest for damages in excess of $75,000 as established by the evidence, the exact amount to be proven at trial; for pre-judgment interest and

post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT X
(Unjust Enrichment against the Bank)

400.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 399 as if fully set forth herein.

401.    The Tri-Star Parties, at the request of the Bank, invested substantial sums of money into the development and construction projects at issue in this case and maintained the properties while they appreciated.

402.    Further, the Bank and its successors in interest either falsely represented or failed to disclose material information to the Tri-Star Parties including without limitation, those matters set out herein.

403.    The Tri-Star Parties' actions in investing substantial sums of money in the projects increased the value of the projects to the benefit of the Bank and its successors in interest.

404.    The Bank and its successors in interest have an appreciation or knowledge of the benefit conferred.

405.    Under the circumstances, it would be inequitable for the Bank or its successors in interest to retain any benefit of the increased value of the projects without paying for its reasonable value.

406.    Moreover, the loan documents relied upon by the Bank and its successors in interest purport to permit the Bank and its successors in interest to obtain double and triple recovery of the indebtedness, which would serve to unjustly enrich the Bank and its successors in interest and subject the Tri-Star Parties to immediate and irreparable harm inconsistent with

Kansas law.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC request that this Court enter judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest for damages in excess of $75,000 as established by the evidence, the exact amount to be proven at trial; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT XI
(Publication of Injurious Falsehoods)

407.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 405 as if fully set forth herein.

408.    The Bank its successors in interest, directly and through their agents, made statements regarding the Tri-Star Parties to someone other than the Tri-Star Parties which were false and in violation of the Bank's policies and procedures and violations of law.

409.    The Bank and its successors in interest published injurious falsehoods concerning the Tri-Star Parties including the false statements concerning the Tri-Star Parties' alleged default under any agreements with the Bank.

410.    Said statements were published to the public and third parties, and the publications were made under such circumstances that third parties would repeat the injurious falsehoods published by the Bank and its successors in interest, that the Bank knew that the communications would be injurious to the Tri-Star Parties' businesses and properties, that the Bank and its successors in interest understood that the communications applied specifically to the Tri-Star Parties' businesses and properties, that there would be a pecuniary loss likely to

73

result to the Tri-Star Parties as a result of the publication by the Bank and its successors in interest, that the Bank and its successors in interest had knowledge of the falsity of the statements or were recklessly disregarding the truth or the falsity of the statements before they made them, that the Bank and its successors in interest were motivated by ill-will, that the Bank and its successors in interest intended to affect the Tri-Star Parties' interest in an unprivileged manner by violating representations of privacy that the Bank had made to the Tri-Star Parties, all as more fully set forth herein.

411.    The Bank and its successors in interest made the statements with malice.

412.    The statements by the Bank and its successors in interest tended to injure the Tri-Star Parties' reputation and/or injure the Tri-Star Parties in their efforts to maintain their businesses and their projects.

413.    The statements caused damages to the Tri-Star Parties and their businesses.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC respectfully request that the Court enter judgment in favor of theTri-Star Parties and against the Bank and its successors in interest for damages in excess of $75,000 as established by the evidence, the exact amount to be proven at trial; for pre-judgment interest and post-judgment interest as provided by law; for their costs and expenses incurred herein; and for any and all other relief that this Court deems just and proper.

## COUNT XII
### (Rescission)

414.    The Tri-Star Parties incorporate the allegations of paragraphs 1 through 413 as if fully set forth herein.

415.    At the time the parties executed the Loan Documents, a material element to the agreements were those representations by the Bank as set out herein.

416.    There was a mistake by the Tri-Star Parties and the Bank concerning the terms of the Loan Documents.

417.    The mistake of both parties at the time the parties executed the Loan Documents rendered the Loan Documents void or voidable by mistake.

418.    As a result of the parties' mistake, the Tri-Star Parties are entitled to rescind the alleged agreements.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC pray to this Court for a judgment rescinding the Notes, the Mortgages, the Change in Terms Agreements and the Guaranties based on the mistake of Plaintiffs and the Defendant; for the Plaintiffs' costs and expenses incurred herein including attorneys' fees; and for any and all other relief that this Court deems just and proper.

## COUNT XIII
(Equitable Subordination)

419.    The Tri-Star Parties incorporates the allegations of paragraphs 1 through 418 as if fully set forth herein.

420.    The Tri-Star Parties invested substantial sums of money into the project and constructed various improvements in connection with the Project.

421.    Further, the Bank either falsely represented or failed to disclose material information to the Plaintiffs including, without limitation, those matters set out herein.

422.    The Bank and its successors in interest engaged in inequitable conduct as more fully set forth herein.

75

423.     The Tri-Star Parties' actions in construction of improvements for the Project and investing substantial sums of money in the project increased the value of the project.

424.     Under the circumstances, the Bank and its successors in interest would receive an unfair advantage and it would be inequitable if the Bank's alleged claim in the Tri-Star Parties' property is permitted to be superior to the interests of the Tri-Star Parties

425.     Under the circumstances, the claimed interest by the Bank and its successors in interest in the property should be subordinated to the Tri-Star Parties' interest in the property.

WHEREFORE, Gregory D. Prieb, the Gregory D. Prieb Trust, Philip W. Martens, the Philip W. Martens Trust, David M. Martens, the David M. Martens Trust, and Tri-Star Development Company, LLC respectfully request that this Court enter its judgment in favor of the Tri-Star Parties and against the Bank and its successors in interest whereby the claimed interest in the property by the Bank and its successors in interest is subordinated to the interest of the Tri-Star Parties in said property; and for any and all other relief that this Court deems just and proper.

## **JURY DEMAND**

The Tri-Star Parties demand a trial by jury as to all claims and issues in the above-entitled matter so triable.

Respectfully Submitted,

PELS ANDERSON, LLC

By: /s/ Jennifer O'Neill Schiffer
Jennifer O'Neill Schiffer, Esq., #974080
4833 Rugby Avenue, 4th Floor
Bethesda, Maryland 20814
Tel: (301) 986-5570
Fax: (301) 986-5571
*Attorney for Plaintiffs*